GILBERTVILLE TRUCKING CO., Inc., The L. Nelson & Sons Transportation Company, Charles G. Chilberg, Clifford J. O. Nelson, Greta C. Carlson, and Kenneth A. H. Nelson, Plaintiffs

v.

UNITED STATES of America, Defendant,

and

Interstate Commerce Commission, Intervening Defendant.

Civ. A. 60-562-S.

United States District Court
D. Massachusetts.

July 7, 1961.

Henry E. Foley and Loyd M. Starrett, Foley, Hoag & Eliot, Mary E. Kelley, John J. Graham, Boston, Mass., for plaintiff.

James W. Noonan, Asst. U. S. Atty., Boston, Mass., Robert W. Ginnane, Gen. Counsel, and James Y. Piper, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., John H. D. Wigger, Dept. of Justice, Washington, D. C., for defendant.

Before WOODBURY, Circuit Judge, SWEENEY, Chief Judge, and WYZANSKI, District Judge.

WYZANSKI, District Judge.

Stated briefly, and subject to later amplification, this is a case brought by two motor carriers and four individuals who complain that the I.C.C. has invalidly ordered one of the individuals to divest himself of stock he holds in one of the two carrier companies, and also has invalidly denied the application of one of the two carrier companies to merge into the other carrier company.

The suit in this Court began with a complaint filed August 8, 1960 seeking to enjoin and set aside the following orders of the I.C.C.:

(1) the order of June 9, 1959 entered in No. MC–F–6099, (in the matter of The L. Nelson & Sons Transportation Co.—Control and Merger—Gilbertville Trucking Co., Inc.), and No. MC–F–6178, (in the matter of The L. Nelson & Sons Transportation Co.—Investigation of Control—Gilbertville Trucking Co., Inc.), [the said order being set forth in the complaint as "Appendix B"];

(2) the order of February 15, 1960, entered in the same matters, [the said order being set forth in the complaint as "Appendix C"]; and

(3) the order of July 5, 1960, entered in the aforesaid No. MC–F–6099 and No. MC–F–6178, and also in No. MC–42871 (Sub–No. 3) (in the matter of The L. Nelson & Sons Transportation Company), [the said order being set forth in the complaint as "Appendix D"].

Hereafter these will be called orders 1, 2, and 3, respectively.

Jurisdiction to hear the complaint is conferred on this Court by chapters 85, 87, 155, and 157 of the Judicial Code, 28 U.S.C. §§ 1336, 1398, 2284, and 2321–2325.

Administratively, this case began when on October 6, 1955, pursuant to § 5(2) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2), The L. Nelson & Sons Transportation Company, (hereafter called Nelson Co.), and Gilbertville Trucking Co., Inc. (hereafter called Gilbertville Co.) filed with the I.C.C. an application to merge the operating rights and properties of Nelson Co. as transferee and Gilbertville Co. as transferor. This is the matter to which the I.C.C. gave the number MC–F–6099. The governing Section, § 5(2), provides as follows, so far as pertinent:

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of

the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise; * * *

"(b) Whenever a transaction is proposed under subdivision (a) of this paragraph, the carrier or carriers or person seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants (and, in case carriers by motor vehicle are involved, the persons specified in section 305(e) of this title), and shall afford reasonable opportunity for interested parties to be heard. If the Commission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing; and a public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall en-

ter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: *Provided,* That if a carrier by railroad subject to this chapter, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6) of this section, is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

"(c) In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected."

Other relevant sections meriting citation here are §§ 5(4), 5(5) and 5(6), which read as follows:

"§ 5, par. (4). Control effected by other than prescribed methods. It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether di-

rectly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions. As used in this paragraph and paragraph (5) of this section, the words 'control or management' shall be construed to include the power to exercise control or management. Feb. 4, 1887, c. 104, Pt. I, § 5, 24 Stat. 380; June 16, 1933, c. 91, Title II, § 202, 48 Stat. 217; Sept. 18, 1940, c. 722, Title I, § 7, 54 Stat. 905."

"§ 5, par. (5). Transactions deemed to effectuate control or management. For the purposes of this section, but not in anywise limiting the application of the provisions thereof, any transaction shall be deemed to accomplish or effectuate the control or management in a common interest of two carriers—

"(a) if such transaction is by a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier;

"(b) if such transaction is by a person affiliated with a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier;

"(c) if such transaction is by two or more persons acting together, one of whom is a carrier or is affiliated with a carrier, and if the effect of such transaction is to place such persons and carriers and persons affiliated with any one of them and persons affiliated with any such affiliated carrier, taken together, in control of another carrier. Feb. 4, 1887, c. 104, Pt. I, § 5, 24 Stat. 380; June

16, 1933, c. 91, Title II, § 202, 48 Stat. 217; Sept. 18, 1940, c. 722, Title I, § 7, 54 Stat. 905."

"§ 5, par. (6). Affiliation with a carrier defined. For the purposes of this section a person shall be held to be affiliated with a carrier if, by reason of the relationship of such person to such carrier (whether by reason of the method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier. Feb. 4, 1887, c. 104, Pt. I, § 5, 24 Stat. 380; June 16, 1933, c. 91, Title II, § 202, 48 Stat. 217; Sept. 18, 1940, c. 722, Title I, § 7, 54 Stat. 905."

December 20, 1955, pursuant to § 5(7) of the Act, 49 U.S.C.A. § 5(7), the I.C.C., reciting that it appeared that control or management of Gilbertville Co. in a common interest with Nelson Co. may have been effectuated and may be continuing in violation of § 5(4) of the Act, 49 U.S.C.A. § 5(4), ordered an investigation on the Commission's own motion. This is the matter to which the I.C.C. gave the number MC–F–6178. The relevant statutory section, § 5(7) reads as follows:

"Investigation by Commission of effectuation of control by nonprescribed methods. The Commission is authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether any person is violating the provisions of paragraph (4) of this section. If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as

may be necessary, in the opinion of the Commission, to prevent continuance of such violation. The provisions of this paragraph shall be in addition to, and not in substitution for, any other enforcement provisions contained in this chapter; and with respect to any violation of paragraphs (2)–(12) of this section, any penalty provision applying to such a violation by a common carrier subject to this chapter shall apply to such a violation by any other person. Feb. 4, 1887, c. 104, Pt. I, § 5, 24 Stat. 380; June 16, 1933, c. 91, Title II, § 202, 48 Stat. 217; Aug. 9, 1935, c. 498, § 1, 49 Stat. 543; Sept. 18, 1940, c. 722, Title I, § 7, 54 Stat. 905."

December 20, 1955, the I.C.C. assigned both matters for concurrent hearing on a joint record.

August 16, 1955 the I.C.C. referred these matters to Examiner Baumgartner for hearing on September 17, 1956. September 17 through September 26, 1956, Examiner Baumgartner held the hearing. He served his report June 8, 1957. July 8, 1957 the applicants filed exceptions to the report. The exceptions being disallowed, the I.C.C., by Division 4, on February 26, 1958 entered a report and an order reciting that "Gilbertville [Co.] or Nelson [Co.] have on various occasions violated the provisions of Section 206 and certain regulations promulgated under Part II of the Act", and that "Nelson [Co.] and Gilbertville [Co.] are controlled or managed in a common interest in violation of Section 5(4)", and ordering that Nelson Co. and Gilbertville Co. and four individuals, Chilberg, Clifford J. O. Nelson, Greta C. Carlson, and Kenneth A. H. Nelson cease violations of § 5(4) of the Act, and denying the companies' application to merge.

April 1, 1958 the applicants filed with the I.C.C. a petition for reconsideration of, and to set aside, the February 26, 1958 order of the Commission by Division 4.

October 2, 1958, Division 4 re-opened the proceedings.

June 9, 1959 the full Commission entered a report and order. The full Commission recited that it had recalled the proceedings from Division 4 for consideration and determination. Simultaneously the I.C.C. found that Kenneth Nelson had acquired control of Gilbertville Co. about March 2, 1953 in violation of § 5(4) of the Act, and pursuant to the alleged authority of § 5(7) of the Act, ordered him to divest himself of his stock interest in Gilbertville. This is Order 1 under review in this Court.

August 17, 1959 both companies filed with the I.C.C. a petition for reconsideration. February 15, 1960 the I.C.C. denied the petition and made effective the earlier order of June 9, 1959. This February 15, 1960 denial and order constitute Order 2 under review in this Court.

March 7, 1960 Nelson Co. petitioned the I.C.C. for cancellation of all its outstanding certificates of convenience and necessity, coincident with the vacation of the I.C.C. orders of June 9, 1959 and February 15, 1960. March 11, 1960 the I.C.C. temporarily stayed the effectiveness of its orders of June 9, 1959 and February 15, 1960. Then July 5, 1960 the I.C.C. denied the petition of March 7, 1960, vacated the stay order of March 11, 1960, and reinstated its orders of June 9, 1959 and February 15, 1960. This cumulative disposition of July 5, 1960 is Order 3 under review in this Court.

Having portrayed the skelton of the administrative proceedings before the I. C.C., and before examining in detail the factual record, we may notice the general nature of the principal questions which it presents.

(1) Is the order of June 9, 1959 invalid because it is not supported by findings which in form comply with the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. or with general principles governing I.C.C. procedure?

(2) Is the order of June 9, 1959 invalid because, even if the findings are proper

in form, they are not supported by substantial evidence?

(3) Is the order of June 9, 1959 invalid because, even if the findings are proper in form and in substance, they lack the specific character adequate to support an order to Kenneth A. H. Nelson to divest himself of all his stock in Gilbertville Trucking Co.?

(4) Is the order of June 9, 1959 invalid because, even if the findings are proper in form and in substance, they do not warrant an order denying the merger application?

We now turn to a more detailed examination of the record before the I.C.C. In appraising this record we repeat that the only orders here under review are orders of the full commission and that the only questions now pertinent, as stated above, fall into two divisions: first, are the full commission's orders sustained by findings, made by it, adequate in form and in substance, and second, are those orders authorized by statutory provisions.

The best way to deal with the first set of questions is to set forth in full the essential portion of the text of the I. C.C. report of June 9, 1959, with the supporting transcript references conveniently supplied by defendants in this Court. But before this is done, it will be helpful to set forth, as it were, a syllabus of their import.

The text, about to be quoted, shows a close business relationship between Kenneth A. H. Nelson, his mother, and her six other children. Originally they were all associated as shareholders in the Nelson Co. And the seven children are even now associated as equal owners of The Bergson Company. In 1952 Kenneth was still the owner of 92 of the 500 shares of the Nelson Co. He was in that year paid $15,650 as a "tariff consultant." The nature of this relationship and of this work is not precisely shown. Kenneth claims he held himself out not as an employee or officer but as an independent contractor; yet if he had clients other than Nelson Co. they were not shown.

Moreover, in his work for Nelson his duties (properly inferable from his title, his rate of compensation, and miscellaneous specific minor incidents,) trench upon administrative or executive rather than strictly independent professional advisory functions.

Kenneth continued as tariff consultant during part of 1953. Sanol J. Solomon, a public accountant, who had rendered Nelson Co. continuous services almost since its organization (Tr. 28), and who as a principal witness before the I.C.C. was on the stand for several days, testified that Nelson Co. paid Kenneth $13,800 in 1953, and that some of the services for which that payment was made were performed after Kenneth's acquisition of the stock of Gilbertville Co. (Tr. 427), that is, after March 2, 1953. That date is significant because by a contract dated on that same March 2, 1953, Kenneth in cooperation with his half brother, Oscar Chilberg, and following consultation with Solomon, purchased all the shares of Gilbertville Co.

At a later date, Kenneth bought out Oscar. And the business of Gilbertville Co. continued and flourished under the direction and ownership of Kenneth.

At all times Nelson Co. and Gilbertville Co. shared the lease of a terminal at New York City. At four other terminals, owned by the previously mentioned family company, Bergson Co., Nelson Co. was a lessee, and Gilbertville Co. was a sub-lessee of Nelson Co. Telephones were shared at the terminal.

Equipment of one company is often leased to the other. Both draw upon the same group of drivers to some extent. There has been some commingling of traffic. Some items of expense are shared upon a set formula, not shown to be other than arbitrary.

From these and other less significant subsidiary items, the I.C.C. purported to "affirm the findings in the prior report [of Division 4] and in the report of the examiner, that the control and management of Nelson [Co.] and Gilbertville [Co.] in a common interest has been ef-

fected and is continuing in violation of section 5(4) of the act."

This Court having supplied the foregoing "syllabus", the following quotation from the I.C.C. report of June 9, 1959, to which counsel have added in brackets the apposite transcript references, may now be set forth.

"The evidence shows that Mrs. Linnea Nelson, with two of her seven children, Charles and Oscar Chilberg, inaugurated the business of Nelson as a partnership in 1930 [Tr., Chilberg, 480]. It was incorporated in 1947 [Tr., Solomon, 193, and Ex. A to application]. As of May 14, 1948, of the 500 shares of authorized capital stock outstanding, 300 shares were held by Mrs. Nelson and 50 shares each by Charles and Oscar, and Clifford and Kenneth Nelson [Tr., Solomon, 30–31, 194]. Mrs. Nelson died in 1950 [Tr., Solomon, 30–31, 194–95] and her stock, less 6 shares which subsequently became treasury stock, was devised 42 shares each to her seven children [Tr., Solomon, 31–32, 194, 212]. In June and September, 1951, and in January 1953, Oscar and Kenneth sold their stock (92 shares each) to Charles and Clifford, respectively, and resigned from the business [Tr., Solomon, 29–30, 32–34, 39, 195–99, 209, 211]. Since the latter date Charles and Clifford have held 226 shares each of the capital stock of Nelson [Tr., Solomon, 202, 213, 215–16, 277–78]. Kenneth and Oscar have been neither officers nor directors since 1951 [Tr., Solomon, 35–36]. However, from September 1, 1951, to March 1, 1953, Kenneth had an office at one of Nelson's terminals where as a 'free lance' tariff consultant, he served only Nelson [Tr., Solomon, 180–82, 269–74, 422–27; Ex.Rept., sh. 44], and was paid by Nelson $15,650 in 1952 [Tr., Solomon, 271–72] and $13,829 in 1953 [Tr., Solomon, 277, 425–427].

"Under a contract of March 2, 1953 [Tr., appl. Ex. 22], after con-sultation with his accountant and financial adviser [Tr., Solomon, 50–51, 83, 312–13], Kenneth agreed to purchase the capital stock of Gilbertville, consisting of 100 shares, for a net consideration of $22,447 [Tr., Solomon, 67–68, 358–60], of which $10,000 was evidenced by a promissory note signed by him and Oscar [Tr., Solomon, 67–69, 324–36, 358–61, 371, 435]. A note of $30,000 was secured from a bank on a note signed by the same individuals to help finance the transaction and to furnish Gilbertville with working capital [Tr., Solomon, 55–56, 322–23, 330–31, 370–72, 460–61]. Upon the transfer of that stock 51 shares were held by Kenneth, 48 by Oscar, and 1 share by Kenneth's attorney [Tr., Solomon, 78–79, 160, 335–36]. In March, 1954, Oscar transferred his shares to Kenneth [Tr., Solomon, 161–62, 332–35] who, in turn, transferred 24 shares each to his wife and to the manager of their terminal at Gilbertville, apparently in name only [Tr., Solomon, 80–83, 161–63, 332–40; K. Nelson, 689–99, 719–23].

"The Bergson Company, organized January, 1953, is a real estate holding company [Tr., Solomon, 420], whose 490 shares of stock are owned in equal amounts by the seven children, and they are its directors [Tr., Solomon, 172–73, 421]. Kenneth is not an officer of Bergson [Tr., Solomon, 173]. Of the five terminals utilized by Nelson in its operations, four are leased from Bergson [Tr., Solomon, 172–77, 430–32], including a terminal at Rockville-Ellington, Conn., which is also used as the headquarters of both Nelson and Gilbertville [Tr., Solomon, 148–49; K. Nelson, 699–700, 725]. The latter subleases terminal facilities from Nelson at Rockville-Ellington, Newton, Mass., and Woonsocket, R. I., owned by Bergson [Tr., Solomon, 172–77], and at New York City, owned by other parties [Tr., Solomon, 432, 447]. At a garage and repair shop

maintained at Rockville-Ellington, Nelson performs about 25 percent of the repair work on the equipment of Gilbertville [Tr., Solomon, 165–66, 445–46; K. Nelson, 796–99, 824–27; Shea, 888–89, 1120–22].

"At two of the terminals owned by Bergson, at the one in New York City, and at four other points, Nelson and Gilbertville have the same telephone numbers [Tr., Chilberg, 679–80; K. Nelson, 77–78, 786]. The total cost of leased interterminal telephone lines is $1,100 a month and Gilbertville pays Nelson $400 a month as sublessee [Tr., Chilberg, 679–81, 692; K. Nelson, 785–86, 805]. Nelson occasionally leases equipment from Gilbertville [Tr., Solomon, 168–70, 412–13; Chilberg, 484–85, 512–13], athough the latter constantly and frequently leases from a pool of equipment maintained by Nelson [Tr., Solomon, 170; Chilberg, 524, 543–46; K. Nelson, 702–13, 819; Shea, 835–37, 844–46, 870; LaCour, 1023, 1029–31]. Both draw upon the same group of drivers [Tr., K. Nelson, 814–19; Shea, 853–54, 883; LaCour, 1005–09] and information relative thereto, including medical certificates, are maintained in the files of both companies [Tr., K. Nelson, 728–29, 814–16]. To the extent they interline [Tr., Chilberg, 495–99, 508; K. Nelson, 738–41], revenues are divided on a fixed percentage basis [Tr., Chilberg, 524–26, 691–92; K. Nelson, 707–09, 741–43; LaCour, 1016–20], and Nelson does all of the billing for such traffic [Tr., Chilberg, 526–28; Shea, 854–59]. Frequently the same driver will be employed by both companies during the same pay period [Tr., K. Nelson, 814–20; Shea, 854, 883; LaCour, 1005–09], and on those occasions where a shipment moves from a point in the territory of one to a point in the territory of the other the same driver and vehicle will perform the through movement [Tr., K. Nelson, 782–83, 807–08; Shea, 1120–22], under prearranged lease arrangements [Tr., K. Nelson, 762–69, 813–14; Shea 845–47, 1120–22]. The two companies use the same source for accounting and financial advice [Tr., Solomon, 27–28, 83, 144, 189–91, 348, 440–41], each operates to some extent, at least, under managerial direction from officers of the other [Tr., Shea, 847–53, 860–61; LaCour, 1015–16], and they are liberal with each other in the settlement of intercompany accounts [Tr., LaCour, 1021–22, 1028–29]. There has also been a commingling of traffic of the two carriers in the same vehicles whenever it suits their convenience [Tr., Shea, 901–915, 916–22, Com.Ex. 29; 925–932, Com.Ex. 30; 932–36, Com.Ex. 31; 936–40, Com.Ex. 32; LaCour, 1040–50, Com. Ex. 34].

"As of March 1953, Gilbertville had one truck, three tractors, and four trailers [Tr., Solomon, 69–70, and Appl. Ex. 22], and had a deficit in surplus of $39,868 [Tr., Solomon, 90]. As of December 31, 1953, however, it had a net worth of $18,935 [Id]. In 1953 Gilbertville's revenues were $75,489 [Ex. B–6(3) to application], whereas for the first seven months of 1956 they had increased to $444,777 [Appl. Ex. 8]. Its equipment increased substantially during that period [Tr., Solomon, 233–38, 245–48, 408, Appl. Ex. 23; K. Nelson, 702–95, Appl. Ex. 25]. In 1953 the revenues of Nelson were $895,774 [Ex. A–7(3) to application] and for the first seven months of 1956 they were $630,607 [Appl. Ex. 4]. Under an authority granted by this Commission, Gilbertville, on June 16, 1954, acquired the operating rights of one Louis Marner, doing business as Wolff's Express [Tr., Solomon, 234–35, 389, Ex. B to application, Sh. 6]. In April or May of 1954, Charles Chilberg and Clifford Nelson negotiated for the capital stock of R. A. Byrnes, Incorporated [Tr., Solomon, 386–90], herein called Byrnes, and

upon approval of this Commission [on May 15, 1956, Division 4 report, 75 M.C.C. 45, at 54; Appendix 'F' to complaint, Sh. 16], the transaction was consummated August 21, 1956 [Tr., Solomon, 389—90, 394-95]. The general-commodity authority of Byrnes [Ex. A to application, Sh. 1] complements that of Gilbertville [Ex. B to Application, Shs. 4 and 5], and by interchange a through service on general commodities can be provided between points in Massachusetts, Rhode Island, and Connecticut, on the one hand, and, on the other, points south thereof to the District of Columbia. Considering all the facts of record, we are of the opinion, and find, that Kenneth Nelson was affiliated with Nelson within the meaning of section 5(6) at the time he purchased the stock of Gilbertville, and that the conclusive presumption of section 5(5) applies; we affirm the findings in the prior report, and in the report of the examiner, that the control and management of Nelson and Gilbertville in a common interest has been effected and is continuing in violation of section 5(4) of the act."

Complainant's initial objection is that the language just quoted and other like passages do not constitute the sort of findings required by § 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(b), or by established principles appropriately and traditionally governing findings of fact prepared by administrative agencies.

■ The answer is that it is no more requisite for agencies than for courts, acting under Rule 52 of Federal Rules of Civil Procedure, 28 U.S.C.A., slavishly to set forth in wooden, numbered, footnoted paragraphs every step in the finding process. Cf. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 193-194, 80 S.Ct. 229, 4 L.Ed. 2d 223. Some agencies, like some courts, prefer to put findings in narrative form, in the hope of redeeming judicial writing from the charge that it is arid, stilted, or,

to borrow Chief Judge Cardozo's happy choice of an adjective, "agglutinative". If a fact-finder has the talent of Justice Holmes, his findings are not to be rejected because they are reminiscent of what (to adopt his three classical categories) Justice Holmes would have called a sting ray rather than a kitchen knife, or a razor blade. The purpose of findings of fact is to furnish the parties and the reviewing court with a sufficiently clear basis for understanding the premises used by the tribunal in preparing its conclusions of law, adjudications, and orders. This purpose the I.C.C. has fulfilled in the case at bar, as is demonstrated by the extended quotations set forth above. Indeed to prescribe for every fact-finder the mechanical process for which complainants plead would in all probability cause agency heads, judges, and others with like responsibility to depart further from the pungent, individualized standard of the best Anglo-American judicial writing and to delegate more than they now do to anonymous law clerks. In the name of formality, rigor, and precision, we may rob the law of that style and distinction, which both reflect personal consideration and show a mastery of the art of successful persuasion.

■ The I.C.C. findings are satisfactory not merely in form but in substance. The transcript references enclosed in the quotations prove that the statements of the I.C.C. are supported by evidence. Admittedly a modicum of the findings are trivial to the point of demonstrable irrelevance. But if a reviewing court rejects a particular item as imponderable or inconsequential, that court need not remit the case for excision of that item and for a re-weighing of the remaining mass. When a web of fact is woven *to enclose one dominant issue of fact,* (here the issue of common control) the pulling out of a few minor strings at points of less than crucial significance does not suggest that the net fails to hold. Nor does it require a new total appraisal.

■ Here complainants attack the I. C.C. for its inclusion in its report of some

innocent conduct, or conduct of ambiguous nature. A reasonable reviewer would not conclude that the deletion of all reference to that conduct would alter or modify the I.C.C.'s ultimate and essential finding "that the control and management of Nelson and Gilbertville in a common interest has been effected and is continuing in violation of section 5(4) of the act."

The next issue is whether as a matter of substantive law the subsidiary findings are adequate to show that sort of "control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly," which is proscribed by § 5(4) of the Act. The comprehensive statutory outlawing indicates a fixed Congressional determination to pierce veils and search for the naked truth. We are to look for the presence of unified power, not to palter over dictionary definitions, nor even to be our own lexicographer. Looking through the veil we see far, far more than one company owned by a brother of the dominant owner of another company, or one company managed by a former professional adviser of another company. Many phases of the two businesses have been allowed to converge and not just kept running in parallel series. We can see as the I.C.C. could see a design not of mere cooperation but of purposeful dovetailing for a common set of ends. Indeed the whole convergence begins with the purchase of shares in a second company made by an individual at a moment when he is not shown to have severed a relationship to the arterial traffic nerve of the first company. And after the purchase, the operations of the two companies are so located, so served by employees, so closely identified by common avenues of public communication and approach that the ultimate finding made by the I.C.C. and the derived legal conclusion announced by the I.C.C. are not merely reasonable but inevitable to an unprejudiced, sophisticated mind. For this Court to reject this finding and this conclusion reached by a body informed of the transportation business and its practices, sensitive to the policy it administers under legislative delegation, would be not merely to usurp an administrative function but to displace a legislative prerogative.

The foregoing reasoning does not (despite complainants' contrary arguments,) require resort to any legislatively enacted definitions or presumptions. But it is meet to observe that the reasoning of the I.C.C. and of this Court is confirmed, and at no juncture contradicted, by the statutory definitions and presumptions. No more is necessary than to quote once more the relevant sections of the Act. Section 5(5) provides:

"For the purposes of this section, but not in anywise limiting the application of the provisions thereof, any transaction shall be deemed to accomplish or effectuate the control or management in a common interest of two carriers—

"(a) if such transaction is by a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier;

"(b) if such transaction is by a person affiliated with a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier;

"(c) if such transaction is by two or more persons acting together, one of whom is a carrier or is affiliated with a carrier, and if the effect of such transaction is to place such persons and carriers and persons affiliated with any one of them and persons affiliated with any such affiliated carrier, taken together, in control of another carrier."

Section 5(6) provides:

"For the purposes of this section a person shall be held to be affiliated with a carrier if, by reason of the relationship of such person to such carrier (whether by reason of the

method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier."

And Section 1(3) (b) of the Act, 49 U.S. C.A. § 1(3) (b), which is applicable broadly to motor carriers as well as other carriers, provides:

"For the purposes of sections 5, 12(1), 20, 304(a) (7), 310, 320, 904 (b), 910, and 913 of this title, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control. Feb. 4, 1887, c. 104, Pt. I, § 1, 24 Stat. 379; June 29, 1906, c. 3591, § 1, 34 Stat. 584; June 18, 1910, c. 309, § 7, 36 Stat. 544; Feb. 28, 1920, c. 91, § 400, 41 Stat. 474; June 19, 1934, c. 652, § 602(b), 48 Stat. 1102; Aug. 9, 1935, c. 498, § 1, 49 Stat. 543; Sept. 18, 1940, c. 722, Title I, § 2(a), (b), 54 Stat. 899."

■ A penultimate issue is whether, having found that § 5(4) of the Act was violated by Kenneth's acquisition of stock in Gilbertville Co., the I.C.C. was empowered to order him to divest himself of the stock. Congress did not specify this remedy. It left the matter at large to the discretion of the I.C.C. The dele-

gated power was conferred by § 5(7) in these words:

"Investigation by Commission of effectuation of control by nonprescribed methods. The Commission is authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether any person is violating the provisions of paragraph (4) of this section. If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation. The provisions of this paragraph shall be in addition to, and not in substitution for, any other enforcement provisions contained in this chapter; and with respect to any violation of paragraphs (2)–(12) of this section, any penalty provision applying to such a violation by a common carrier subject to this chapter shall apply to such a violation by any other person. Feb. 4, 1887, c. 104, Pt. I, § 5, 24 Stat. 380; June 16, 1933, c. 91, Title II, § 202, 48 Stat. 217; Aug. 9, 1935, c. 498, § 1, 49 Stat. 543; Sept. 18, 1940, c. 722, Title I, § 7, 54 Stat. 905."

These are words of adequate amplitude to authorize a divestiture order. United States v. E. I. duPont de Nemours and Company, 1961, 366 U.S. 316, 81 S. Ct. 1243, 6 L.Ed.2d 318; F.T.C. v. Mandel Bros., 359 U.S. 385, 392–393, 79 S.Ct. 818, 3 L.Ed.2d 893; American Power & Light Co. v. S. E. C., 329 U.S. 90, 106, 112–113, 118, 67 S.Ct. 133, 91 L.Ed. 103; Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 193–194, 61 S.Ct. 845, 85 L.Ed. 1271. Indeed when the I.C.C. has found that an offender has unlawfully acquired control of a carrier and continues to hold the acquisition, an order of divestiture has a fitness so perfect that the order not merely is obviously a suitable exercise of discretion, but needs no gloss.

The point just made also answers complainants' contention that the I.C.C. order of June 9, 1959 is defective because it is not buttressed by a preceding finding specifically setting forth the considerations which, after careful weighing, led the I.C.C. to command the disgorging. When the wrong consists in yielding to an appetite for unlawful acquisition, no tribunal is called on to write an essay on why it has given greater weight to the public demand that the wrongdoer immediately discharge himself, than the private demand of the wrongdoer that he be allowed, absolutely or conditionally, to keep what he has swallowed. As the cases cited above show, the law is full of examples of similar complete remedies instantaneously imposed on prohibited acquisitions, no matter how much time has elapsed since the forbidden event, no matter how embarrassing the requirement of prompt action in an unfavorable market. See United States v. E. I. duPont de Nemours & Co., above.

The final issue is whether the I.C. C. having found, upon investigation, that Kenneth had violated § 5(7) of the Act by acquiring and continuing control of Gilbertville Co., the I.C.C. acted without statutory authority in using that finding as a basis for denying the application of Gilbertville Co. and Nelson Co. that, by merger, the former transfer its assets to the latter. Here the I.C.C. did no more than to refuse lawful unification to companies which it had found had precipitately and perilously effectuated a prohibited union without permission. Under some imaginable circumstances, to have granted the merger application might conceivably be in the public interest. But to deny the application to formalize and strengthen a relationship already in part achieved by unlawful conduct is a clearly proper exercise of a delegated discretionary authority.

Inasmuch as the objections raised to the I.C.C. order of June 9, 1959 are all without merit, it follows that there can be no valid objection to the I.C.C. order of February 15, 1960 which merely rein-

stated it, nor to the I.C.C. order of July 5, 1960 which merely refused to allow Nelson Co. to escape the effect of the June 9, 1959 order by cancelling all its outstanding certificates of convenience and necessity.

Complaint dismissed with prejudice and costs.